W. Eugene BOWMAN, Plaintiff-Appellant,

v.

TENNESSEE VALLEY AUTHORITY; Salary Policy Employee Panel; and Office and Professional Employees International Union, AFL–CIO, Defendants-Appellees.

No. 83–5414.

United States Court of Appeals, Sixth Circuit.

Argued July 10, 1984.

Decided Sept. 24, 1984.

William M. Barker, Dietzen, Dietzen & Barker, J.W. Dietzen, Chattanooga, Tenn., John J. Fogarty (argued), Clearwater, Fla., for plaintiff-appellant.

Herbert S. Sanger, Jr., General Counsel, James E. Fox, Assoc. Gen. Counsel (argued) Justin M. Schwann, Sr., Asst. Gen. Counsel, Alvin M. Cohen, Tennessee Valley Authority, Knoxville, Tenn., S.D. Fuston, Chattanooga, Tenn., Joseph E. Finley, (Salary Policy) (argued), Baltimore, Md., for defendants-appellees.

Before LIVELY, Chief Judge, MARTIN, Circuit Judge, and KRENZLER, District Judge.[*]

LIVELY, Chief Judge.

The question raised by this appeal is whether a collective bargaining agreement which contains neither a union shop nor an agency shop provision may validly grant a preference to union members over non-union employees in avoiding involuntary transfers.

## I.

### A.

The parties stipulated most of the facts. TVA is a governmental corporation created by the Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831–831dd, as amended (The Act). It is empowered by section 3 of the Act, 16 U.S.C. § 831b (1976), to "provide a system of organization to fix responsibility and promote efficiency" among its personnel. Acting pursuant to that section, TVA in 1950 entered into a collective bargaining agreement, the Articles of Agreement, with the defendant Salary Policy Employee Panel (SPEP), which in turn is comprised of several unions. One of SPEP's member unions is the defendant Office and Professional Employees Interna-

[*] The Honorable Alvin I. Krenzler, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

tional Union (OPEIU) which is the collective bargaining agent for the unit which included the position held by the plaintiff, Eugene Bowman.

TVA hired Bowman as a real estate appraiser in its Chattanooga, Tennessee office in 1966. He did that work out of the Chattanooga office until the summer of 1979 when TVA decided that one of the four appraisers then assigned to Chattanooga should be transferred to Florence, Alabama.

In deciding who would be transferred, TVA followed a provision in the Articles of Agreement. Supplementary Agreement S–7 of the Articles set out the following procedure for transfer of employees from a "surplus" location to another duty station:

(1) First, employees at the surplus location are given an opportunity to request transfer to the vacant position. Among those who request transfer, the union members have preference for transfer, and among union members, the one with the earliest current service date has the highest preference.

(2) If no employee at the surplus location requests transfer, an employee at the location may be directed to transfer. In selection among employees at the surplus location for directed transfer, the union members have preference for retention at that location and among union members the one with the earliest current service date has the highest retention standing.

In accord with the agreement, TVA first asked for volunteers for transfer. None of the four appraisers responded. At that time, two of the four were members of the union. One of the union members, William Trundle, had worked for the TVA about 15 years but had joined the union in the spring of 1979 primarily to acquire preference status in case of transfer. Bowman did not belong to the union and was junior in seniority to the other non-union member. As such he was directed to transfer. Bowman refused to report to Florence and eventual-

ly was terminated for refusing to accept the directed transfer.

After TVA notified Bowman he would have to transfer but before it discharged him, the remaining non-union appraiser, Thomas W. Elder, applied for and obtained membership in OPEIU. Thus all three appraisers were union members at the time Bowman was fired. TVA then directed Marion Wright who had the most union seniority but the least seniority with TVA to transfer to Florence. Bowman had greater seniority than Wright.

The parties also stipulated that TVA's policy is that recognition of responsible unions as exclusive collective bargaining agents for its employees provides an orderly and effective means of achieving TVA's programs. The union preference provision, which has been part of the Articles of Agreement since 1950, is considered a form of union security for SPEP's member unions. TVA deems the purpose of the provision is to encourage employees to participate in their unions, and thereby improve employee relations. It considers union membership and participation to be "positive factors of merit and efficiency" relevant to selecting employees for transfer, promotion and retention. However, TVA has rejected proposals for other forms of union security—a union shop or agency shop.

**B.**

Bowman was discharged by TVA on October 29, 1979, when he refused to accept the transfer from Chattanooga to Florence. He pursued grievance procedures on three complaints, including the one involved in this suit, that he was terminated solely because he was not a member of the union. After all grievances were denied he filed this action in federal district court, naming as defendants his employer, TVA, and his collective bargaining agents, SPEP and OPEIU. In his complaint Bowman challenged the provision of the collective bargaining agreement which gives preference to union members over non-member employees in the same bargaining unit in

avoiding involuntary transfers. He alleged that the union preference provision constituted a breach of the unions' duty of fair representation owed to all members of the bargaining unit, union members and non-members alike. Bowman also charged that the union preference provision violated rights guaranteed to him by the First and Fifth Amendments to the United States Constitution.

Upon agreement of the parties, the case was tried without a jury. The district court entered findings of fact and conclusions of law, deciding that Bowman failed to establish any constitutional violations or breach of a duty of fair representation. It entered judgment for the defendants and dismissed the action on the merits. The findings of fact largely reflected the stipulations of the parties.

## II.

█ If we are able to decide this appeal on non-constitutional grounds we will do so and will not reach the First and Fifth Amendment issues. In proceeding this way we follow the longstanding practice of the Supreme Court as set forth by Justice Brandeis, concurring in *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) ("It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case," *quoting Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482), and of this court, *e.g., Seals v. Quarterly County Court of Madison County, Tennessee,* 526 F.2d 216, 219 (6th Cir.1975). Accordingly, we look first at Bowman's claim that the district court erred in finding that there had been no violation of a duty of fair representation.

## A.

█ The duty of fair representation is one which arises as a corollary to a union's right to act as the exclusive representative of a group of employees. This duty is not stated explicitly in any of the federal labor relations laws, but has been found by the Supreme Court to arise by implication from the right of exclusive representation granted by the Railway Labor Act, as amended, 45 U.S.C. § 151, et seq., and the National Labor Relations Act, as amended, 29 U.S.C. § 141, et seq. The seminal decision of the Supreme Court on the duty of fair representation is *Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). There the railroad employer and the union representing locomotive firemen agreed to a provision in a collective bargaining agreement which had the effect of greatly limiting the employment opportunities of Negro firemen who were not members of the union. The Supreme Court concluded that "Congress, in enacting the Railway Labor Act and authorizing a labor union, chosen by a majority of a craft, to represent the craft, did not intend to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority." *Id.* at 199, 65 S.Ct. at 230. The Court pointed out that a minority of the craft could not choose their own bargaining representative or bargain individually under the Railway Labor Act. It likened the duty of the union to represent all members of the craft, whether members of the union or not, at least to the extent of not discriminating against them, to the duty of a legislature to treat equally with all for whom it legislates. *Id.* at 198, 65 S.Ct. at 230.

*Steele* involved racial discrimination by a union operating under the Railway Labor Act, but the principles laid down there have been applied to all types of discrimination by labor unions. This was made clear in *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), and *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), where there were no charges that the alleged discrimination was based on racial animus and where the controlling statute was the National Labor Relations Act. *Vaca v. Sipes* involved the failure of a union to carry a discharged employee's grievance to the final step of

arbitration under the collective bargaining agreement. Harking back to *Steele*, the Court described the duty of fair representation as "a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." 386 U.S. at 182, 87 S.Ct. at 912. The Court then set forth the criteria for finding a union liable for a failure of fair representation:

> A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.

*Id.* at 190, 87 S.Ct. at 916.

### B.

■ Under the Tennessee Valley Authority Act, 16 U.S.C. § 831b, TVA is exempt from the provisions of federal civil service laws and pursuant to the definition sections of the National Labor Relations Act, 29 U.S.C. §§ 142(3), 152(2), it is exempt from that Act. However, neither TVA nor the unions contest the district court's conclusion that the unions are subject to a duty of fair representation. This is so because TVA's authority to bargain collectively with the unions as the exclusive representatives of employees in Bowman's classification derives from provisions of the TVA Act which broadly empower TVA to design its own system of personnel management. Since the duty of fair representation arises by implication as a necessary corollary to the right of exclusive representation, the unions are subject to the same obligation toward non-union members of the employee unit as if they were bargaining under the Railway Labor Act or the National Labor Relations Act.

The defendants argue that the union preference clause in the Articles of Agreement is not an illegal provision which discriminates against employees who are not union members. Rather, they assert, it is a limited union security provision. Other union security provisions are valid, they argue, and the one at issue here is less burdensome on employees than either a union

shop or an agency shop. Under a union shop agreement all employees must join the union representing their bargaining unit within a stated period after being hired or suffer discharge. In an agency shop all employees in a covered unit must pay to the union under penalty of discharge fees equal to their share of the cost to the union of carrying out its duties and responsibilities as their representative. The defendants contend that if provisions which require membership in a union or payment to a union as a condition of retaining employment are valid, surely one which merely grants a special status to union members with respect to involuntary transfers will pass muster.

The district court did not adopt the defendant's arguments. Rather, it cited *Vaca v. Sipes*, and discussed the criteria set forth in that decision. The court found that the agreement for union preference was not arbitrary because it served legitimate purposes of the parties (union membership promotes better cooperation by employees with TVA policies and practices, greater efficiency in operations, eliminates "free riders," and offers a vehicle for advancement from employee status to management). The district court also found no evidence of bad faith on the part of the union in bargaining for the transfer preference, and "taking into account that this provision was forged in the crucible of collective bargaining, the transfer provision is not unfairly discriminatory."

### III.

### A.

■ We consider the defendants' arguments before analyzing the district court's reasoning. It is true that union shops were prohibited under the Railway Labor Act when the *Steele* case was decided because union shops were equated at the time with company unions. However, in 1950 Congress amended the RLA to permit union shop agreements since by then most railroad employees belonged to independent unions and Congress was persuaded that non-union employees should not be permit-

ted a "free ride" by enjoying the benefits of collective bargaining without paying any of the costs. S.Rep. No. 2262, 81st Cong., 2d Sess., *reprinted* in 1950 U.S. Code Cong. & Ad. News 4319, 4321; H.R.Rep. No. 2811, 81st Cong., 2d Sess. 4, *quoted in International Ass'n of Machinists v. Street,* 367 U.S. 740, 762, 81 S.Ct. 1784, 1796, 6 L.Ed.2d 1141 (1961) and *Railway Employees' Dept. v. Hanson,* 351 U.S. 225, 231, 76 S.Ct. 714, 100 L.Ed. 1112 (1956).

The Supreme Court upheld the provisions of the 1950 amendments, *Hanson,* 351 U.S. at 238, 76 S.Ct. at 721, but construed the statutory authorization for compulsory unionism as requiring payment by unwilling union members only of the costs directly related to collective bargaining and as precluding exaction of payment for support of political causes, *Street,* 367 U.S. at 768–69, 81 S.Ct. at 1799–1800. In *Street,* the Court repeated that in *Steele* it had required a union chosen by the majority of employees as the exclusive agent of all employees to fairly represent all, whether members of the union or not. *Id.* at 761, 81 S.Ct. at 1796. The judicially implied duty of fair representation first articulated in *Steele* was one of the bases for congressional acceptance of the union shop amendment. It is because a union which is an exclusive bargaining agent is prohibited from discriminating against any member of the unit it represents that it is permitted to negotiate an agreement which requires all members of the bargaining unit to support its bargaining activities with payments of dues or service fees. The corollary which *Steele* found to exist between the privilege of exclusive representation and the duty of fair representation was cited to justify the union security device of the union shop.

The fact that the defendants might have negotiated a union shop or agency shop agreement, but chose not to do so, does not relieve the unions of their responsibility to fairly represent those employees who have chosen not to join the union. Counsel for SPEP and OPEIU argues that the transfer preference provision is actually a form of agency shop agreement. That is obviously not the case. Bowman was not required to make payments to the unions as a condition of holding his job, and he could not have been fired for failing to make such payments. While the courts have said that a person can be required to make payments to his or her representative to cover the costs of the benefits enjoyed by all, no court has said that a union which fails to obtain a union shop or agency shop agreement may treat non-union members of a bargaining unit in a discriminatory manner. *Steele* and the decisions which have followed it prohibit such treatment.

**B.**

The district court appears to have held that no discrimination was involved in regard to the union preference provision because it was "forged in the crucible of collective bargaining," and that this finding determines the issue of fair representation. We find error in this reasoning in two respects. First, the fact that a provision which favors some members of a unit over others results from collective bargaining does not guarantee that it will avoid being condemned as discriminatory. The duty of fair representation requires the representative to bargain for a contract which does not discriminate against minority members of the unit. *Steele,* 323 U.S. at 201, 65 S.Ct. at 231. An exclusive bargaining representative has a duty "fairly to represent all of those employees [in the bargaining unit], *both in its collective bargaining* with [the employer] ... and in its enforcement of the resulting collective bargaining agreement." *Vaca v. Sipes,* 386 U.S. at 177, 87 S.Ct. at 910 (citations omitted). See also *Journeymen Pipe Fitters Local 392 v. N.L.R.B.,* 712 F.2d 225, 228 (6th Cir.1983) ("As the exclusive labor representative of employees in a bargaining unit, a union has a statutorily-imposed duty to fairly represent all of the employees, union members or not, *in the collective bargaining process* and in the administration of the resulting labor contract."). (Emphasis supplied in both quotations.) The duty of fair repre-

sentation arises first in the negotiation of a collective bargaining agreement, and the fact that an employer and a union agree to a provision which favors one group of unit employees over another does not immunize that provision from attack on the ground of unfair representation.

■ The second flaw in the district court's analysis lies in its emphasis on bad faith. In its opinion the district court quoted from a law review comment to the effect that "an employee disadvantaged by a contract has no claim of unfair representation against his union unless he can demonstrate actual bad faith in negotiation." The quoted language does not accurately reflect the duty of fair representation as interpreted by this court. In *Farmer v. ARA Services, Inc.*, 660 F.2d 1096, 1103 (6th Cir.1981), the court held that bad faith or fraud is not a necessary element of a charge against a union for violation of its duty of fair representation. Similarly, in *Ruzicka v. General Motors Corp.*, 523 F.2d 306, 310 (6th Cir.1975), *cert. denied,* —— U.S. ——, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983), the court stated:

> We believe that the District Court misread *Vaca* when it held that "bad faith" must be read into the separate and independent standards of "arbitrary" or "discriminatory" treatment. Union action which is arbitrary or discriminatory need not be motivated by bad faith to amount to unfair representation.

We find the same error in the district court's treatment of the separate standards in the present case.

### C.

■ We conclude that the union preference provision does discriminate unlawfully against Bowman and other members of the bargaining unit who do not belong to the unions. The unions enjoy the position of exclusive representatives of employees in Bowman's classification under a contract which permits membership within the unit regardless of whether an employee has chosen to affiliate with a union. The duty of fair representation, under these circum-

stances, prohibited the unions from bargaining for or agreeing to any provision which singles out the employees in the unit who are not union members for disparate treatment. As the court stated in *Thompson v. Brotherhood of Sleeping Car Porters*, 316 F.2d 191, 198–99 (4th Cir.1963):

> At least in the absence of a valid union shop agreement—there is no such agreement here—disparate treatment in representation cannot be tolerated when based on the disadvantaged individual's or group's non-membership in the statutory bargaining agent.

In effect the union preference provision denied Bowman, in the instance of an involuntary transfer, of the benefit of seniority which he had acquired in 13 years of employment by TVA. Absent this provision he could have required the transfer to Florence of one of the appraisers with less seniority. As the court in *Jones v. Trans World Airlines*, 495 F.2d 790, 797 (2d Cir. 1974), stated:

> Discrimination in seniority based on nothing else but union membership is arbitrary and invidious and violates the union's duty to represent fairly all members of the bargaining unit.

### IV.

■ Both TVA and the unions insist that this case must be decided on the basis of Bowman's constitutional claims. We disagree. A union which represents groups of employees has a duty of fair representation which derives from its statutory right to be the exclusive representative of all the covered employees, not from a constitutional right of the employees. An act of a union may violate both its duty of fair representation and some constitutional right of the disadvantaged employees, but this is not necessarily true in all cases. Both defendants maintain that this case is controlled in every aspect by *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). In *Abood* the Supreme Court upheld an agency shop agreement to the extent that it required employees who were in the bar-

gaining unit but were not union members to pay "service charges" to the union for "collective-bargaining, contract administration, and grievance-adjustment purposes." *Id.* at 232. The only issue in *Abood* was the constitutionality of this agency shop agreement. This agreement was attacked on the ground that it violated First Amendment rights of non-union teachers. There was no separate claim that the negotiation and enforcement of the agreement violated the union's statutory duty of fair representation. *Abood* was concerned only with the constitutional validity of a particular agreement, an issue we do not reach because this case can be decided on a non-constitutional ground which was pled and argued as a discrete claim for relief.

## CONCLUSION

In his complaint the plaintiff sought declaratory and injunctive relief, reinstatement with seniority rights and damages. Plaintiff is entitled to declaratory and injunctive relief because of the invalidity of the union preference clause in the Articles of Agreement. He is also entitled to reinstatement since his discharge resulted solely from his refusal to comply with an order based on an unlawful provision of the Articles. The case must be remanded for a determination of damages in light of the Supreme Court's recent decision in *Bowen v. United States Postal Service,* 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983). In *Bowen* the Court held that a union may be held primarily liable for that part of a wrongfully discharged employee's damages caused by the union's breach of its duty of fair representation. Prior to *Bowen* this court stated in *Farmer v. ARA Services, Inc.,* 660 F.2d at 1107:

> Where, as in the present case, the union's breach of its statutory duty results also from its wrongful participation in the breach of contract or from the negotiation of discriminatory contractual provisions, then the union may be held jointly and severally liable with the employer or its liability for damages may be apportioned to the extent that it shares responsibility for the damage.

The judgment of the district court is reversed and the cause is remanded for further proceedings as required by this opinion. The plaintiff will recover his costs on appeal.